# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 6, 2009

## NAKOMIS JONES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**Nos. 02-02917-18, 02-04286     W. Mark Ward, Judge**

───────────────

**No. W2009-00258-CCA-R3-PC - Filed December 22, 2009**

───────────────

The petitioner, Nakomis Jones, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing that he received the ineffective assistance of counsel at trial and on appeal. Following our review, we affirm the post-conviction court's denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

R. Todd Mosley (on appeal) and David Christensen (at hearing), Memphis, Tennessee, for the appellant, Nakomis Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The petitioner was convicted by a Shelby County jury of two counts of first degree felony murder, one count of second degree murder, two counts of especially aggravated kidnapping, and three counts of being a felon in possession of a weapon. The trial court merged the multiple murder, especially aggravated kidnapping, and felon in possession of a weapon convictions into one conviction for each offense and sentenced the petitioner to consecutive terms of life, thirty-five years, and three years, respectively. The petitioner's convictions and sentences were affirmed by this court on direct appeal, and the Tennessee Supreme Court denied permission to appeal. See State v. Nakomis Jones, No. W2004-01583-CCA-R3-CD, 2005 WL 2464681, at *1 (Tenn. Crim. App. Oct. 5, 2005), perm. to appeal denied (Tenn. Feb. 27, 2006).

The underlying facts of the case were recited by this court on direct appeal as follows:

Kevin Wiseman testified that he and Jesse Windom were brothers and sold used cars together at Just for You Auto Sales in Memphis. On August 7, 2001, Windom had been working at the car lot, which closed at 5:00 p.m. About 6:00 p.m., Windom telephoned Wiseman and asked him to come to the lot in order for Windom to get a set of keys from Wiseman. Wiseman went to the lot and met Windom, who was driving a black Lexus. A white Dodge Stratus with three African-American men inside pulled into the lot, and the driver of the Stratus got out and began talking to Windom. Wiseman related that the man appeared to know Windom but that Wiseman did not know any of the men in the Stratus. A second man got out of the Stratus and approached Wiseman, and Wiseman saw that the man had a gun. The third man remained in the Stratus but pointed a sawed-off shotgun out of the car and told Wiseman that he would shoot if Wiseman tried to run. The first man, who had been talking to Windom, pulled up his shirt and showed that he had a gun in his pants. Wiseman identified codefendant Norris Ray as the first man and the [petitioner] as the second man. Wiseman related that the third man, who remained in the Stratus, was never identified.

Ray got into Windom's Lexus and started the engine. The [petitioner] then ordered Wiseman to get into the Lexus' trunk. The car started moving, and Wiseman heard a man tell Windom, "[T]ell me where the money is or I'm going to kill you." Wiseman then heard Windom say, "I don't have any money, the police done took it all." After five or ten minutes, Wiseman heard a gunshot and heard Windom yell. He then heard a car door close and heard a man say, "[T]here go the police. You know they're coming." Wiseman recalled that the car began making a lot of turns and that he was sliding around in the trunk. He then heard the car engine cut off and heard the car doors close. Wiseman waited ten or fifteen minutes and began pounding on the trunk. As he was wiping sweat off his face, he hit the inside trunk latch and the trunk popped open. Wiseman said that the men were gone and that he was in the Southwood apartment complex, which is next to the Flairwood apartment complex. He got out of the trunk and saw a friend, who agreed to drive him back to the used car lot. As they were driving, they saw an ambulance at a Mapco convenience store. They stopped at the store and learned that Windom had been shot and was in the ambulance. Windom later died. Wiseman testified that he went to the police department, looked at a photographic array, and identified Norris Ray as the driver of the Stratus. Two days later, he looked at another photographic array and picked out the [petitioner's] photograph. Wiseman testified that he was certain Ray and the [petitioner] were the men who pulled guns on him and his brother. He acknowledged having prior misdemeanor theft convictions.

On cross-examination, Wiseman acknowledged that he initially told police he could only identify the driver of the Stratus. However, two days later he picked out the [petitioner's] photograph and identified him as the second man who ordered him into the trunk. Wiseman also acknowledged that in his initial description of the

second man, he stated that the man had a "medium fade" haircut. He acknowledged that in the [petitioner's] photograph, the [petitioner] had braided hair. He said that he recognized the [petitioner] by his face and that the [petitioner] did not have braided hair at the time of the robbery. He acknowledged that while the [petitioner] was pointing the gun at him, he was not focusing on the [petitioner's] face. He also acknowledged that he never saw who actually got into the Lexus with his brother.

Officer Gary Claxton of the Memphis Police Department testified that on August 7, 2001, at about 6:30 p.m., he was off duty and driving his Nissan Maxima westbound on Winchester Road. He noticed a black Lexus in the lane to turn south onto Tchulahoma Street. Suddenly, a white Dodge Stratus pulled out and nearly hit him. Claxton stated that he swerved to avoid hitting the Stratus and pulled into the turn lane behind the Lexus. He related that all three cars were in the turn lane waiting to turn left onto Tchulahoma and that the Lexus was in front, that his Maxima was behind the Lexus, and that the Stratus was behind the Maxima. While the cars were waiting to turn left, a man jumped out of the backseat of the Lexus and ran into a nearby Mapco parking lot. Claxton stated that the man appeared to be having a panic attack and fell down. The Lexus made a u-turn and drove into the Mapco lot. When the traffic light turned green, Claxton pulled over to let the Stratus pass him. He then wrote down the Stratus' license plate number. The Lexus drove out of the Mapco parking lot and traveled south on Tchulahoma. Claxton began following the Lexus and called a dispatcher to give her the Stratus' license plate number and tell her that "something strange" was going on in the area. Claxton stated that he followed the Lexus for three or four minutes but lost sight of it. He then returned to the Mapco parking lot.

Chandra Jones, Norris Ray's ex-fiancé, testified that she owned a 1998 Dodge Stratus. About 5:00 p.m. on August 7, 2001, she loaned the car to Ray and Ray returned the car later that night. About midnight, the police called Jones' apartment and asked her to come outside. Jones met the police outside and told them that Ray was asleep in her apartment. The police asked her to telephone Ray and ask him to come outside, and she did so. On cross-examination, Jones testified that she did not know the [petitioner] and had never seen him before. She stated that about 6:45 p.m. on August 7, she called her cellular telephone, which was in her car, and a man named Geno answered.

Kim Hughes testified that in August 2001, she lived in the Flairwood apartment complex. On the evening of August 7, the [petitioner] came to her door, told her that his car had broken down on Tchulahoma Street, and asked to use her telephone. Hughes did not know the [petitioner] but handed him her cordless telephone. The [petitioner] appeared nervous and tried dialing a couple of telephone numbers but never completed the calls. While he was using the telephone, Norris Ray walked up to the [petitioner], and the [petitioner] handed him the telephone. Ray

made a telephone call and said, "Geno, come get us." Ray also told Geno that he was at the Flairwood apartment complex. The next day, Hughes saw information on the news about Jesse Windom's shooting and called Crime Stoppers. As a result of her call, a police officer came to her apartment and showed her photographic arrays. Hughes picked out Ray's and the [petitioner's] photographs. She said that the [petitioner] had braided hair when he came to her apartment. On cross-examination, Hughes testified that Crime Stoppers paid her money for her information.

Lieutenant Prentiss Jolly of the Memphis Police Department testified that about 7:35 p.m. on August 7, 2001, he responded to a call at the Mapco convenience store at the intersection of Winchester and Tchulahoma. When he arrived, Jesse Windom had already been transported to the hospital. About 8:15 p.m., Jolly learned that Windom had died. Jolly investigated the case and interviewed Kevin Wiseman and Officer Gary Claxton. As a result of the investigation, the police began looking for a white Dodge Stratus and a black Lexus. Jolly also checked the license plate number that Claxton had provided and learned that the car was registered to Nanny Harris and Chandra Jones. Jolly learned Ms. Jones' address and went to her apartment complex, where he saw a white Dodge Stratus. Jolly telephoned Ms. Jones and asked her to come outside. Ms. Jones came out of the apartment and told Jolly that Norris Ray was her boyfriend and that he was asleep inside the apartment. Ms. Jones then called Ray and asked him to come outside. Ray came out of the apartment, and the police arrested him.

Sergeant Joe Stark of the Memphis Police Department testified that on August 8, 2001, he helped process a white Dodge Stratus and a black Lexus. Stark obtained a fingerprint from the Lexus' outside rear passenger door window. The print was in a downward position, meaning that the person who left the print was either on top of the car or had his hand on the window while the door was open.

Investigator Don Carpenter of the Memphis Police Department testified that he also dusted the Stratus for fingerprints. He recovered a fingerprint from the driver's side window of the Stratus. The print was in a downward position. He also recovered a palm print from the Stratus' outside rear door panel. On cross-examination, Carpenter testified that it was impossible to know how long the prints had been on the car.

Latent Print Examiner Martin Milner of the Memphis Police Department testified that he received the prints that Stark and Carpenter recovered. He submitted the prints to the Automated Fingerprint Identification System (AFIS), a fingerprint database. AFIS gave Milner the names of twenty-five possible matches for the prints. Milner then compared the recovered prints with prints that were on file for those individuals. He concluded that the palm print recovered from the rear door panel of the Stratus matched the [petitioner] and that the fingerprint recovered from

-4-

the Stratus' driver's side window matched Norris Ray. Two fingerprints recovered from the Lexus matched Jesse Windom.

Tom Deering, the Interim Medical Examiner for Shelby County, testified that O.C. Smith performed Windom's autopsy. According to Dr. Smith's autopsy report, the victim was shot once in the abdomen. The bullet entered Windom's right flank area and exited his left hip. The bullet cut through Windom's right common iliac artery and right common illiac vein, causing extensive bleeding and death. The victim's blood tested negative for alcohol and drugs.

Kimbery Tanzy testified that she worked for the Shelby County Criminal Court Clerk's Office. The [petitioner] was convicted of three felony drug offenses in 1996.

Norris Ray testified on his own behalf that about 4:15 p.m. on August 7, he drove Chandra Jones' Dodge Stratus to Geno's apartment. Ray stayed at Geno's apartment for about thirty minutes. Ray's brother, Marvin Jackson, came to Geno's apartment and Ray and Jackson left and went to Jackson's apartment in Frayser. Ray left the Stratus and its keys at Geno's house. About 5:15 p.m., Daphne Love came to Jackson's apartment and Love and Ray drove to Dyersburg. There, they smoked marijuana, had sex, and visited Ray's other brother, Anthony Jackson. Love drove Ray back to Geno's apartment in Memphis about 10:00 p.m. Ray got the Stratus' keys from Geno's girlfriend, drove the Stratus to Chandra Jones' apartment, and went to sleep. At some point, the police called Ms. Jones' apartment and Ray answered the telephone. The police asked to speak with Ms. Jones and told Ray that Ms. Jones' car had been involved in a hit-and-run accident. Ray thought the call was a joke and hung up. The police called back repeatedly, and Ray hung up each time. Finally, he gave the telephone to Ms. Jones and Jones went outside to speak with the police. The police then called Ray and asked him to come outside. Ray left the apartment, and the police arrested him. Ray related that he had seen the [petitioner] previously but did not know him. He also stated that he did not know Kim Hughes and had never seen her before.

On cross-examination, Ray acknowledged having prior convictions for sexual battery and burglary. He stated that he knew Jesse Windom but that they did not "hang out" together. Ray stated that he was not disputing that Ms. Jones' white Stratus was used during Windom's killing. However, he stated that Geno and two other men must have used Ms. Jones' car and kidnapped Windom and Wiseman.

Id. at **1-4.

-5-

Thereafter, the petitioner filed a timely *pro se* petition for post-conviction relief as well as a 110-page amended petition, arguing he received the ineffective assistance of trial and appellate counsel and raising other issues surrounding his convictions. After the appointment of counsel, two other amended petitions were filed, and an evidentiary hearing was conducted on two dates in October 2008.

At the hearing, the petitioner testified that counsel represented him at trial and on appeal.[1] The petitioner met with counsel "once every several months" from November or December 2002 until counsel withdrew after the direct appeal. The petitioner stated that he and counsel discussed certain aspects of his case but never discussed a theory of defense. The petitioner told counsel that he was not guilty of the charges against him so there must have been something wrong with the eyewitness identifications. He also noted discrepancies in the descriptions given by the various witnesses.

The petitioner said that he provided counsel with a letter containing the names and addresses of potential alibi witnesses, his cousin, Timothy Hardrick, and Alice Johnson, both of whom he was with on the day of the murder. The petitioner stated that counsel never contacted his alibi witnesses, and none of his alibi witnesses were called to testify at trial. The petitioner said that he spoke with counsel's investigator, Clark Chapman, and asked Chapman what counsel had discovered with regard to his alibi witnesses. According to the petitioner, Chapman indicated to him that counsel was "checking into it." The petitioner denied telling Chapman to stop trying to locate Hardrick and Johnson.

The petitioner testified that he and counsel never discussed any issues related to his appeal. He said that he specifically wanted counsel to appeal any issues involving the court's not allowing him to introduce a Court TV documentary that highlighted the victim's identification of him. He also said that when the trial judge and the attorneys were discussing the admission of the Court TV documentary, Kevin Wiseman, the surviving victim, was still in the courtroom. The petitioner explained that the reason for seeking admission of the documentary was to impeach Wiseman's testimony as to his identification of the petitioner, and Wiseman heard the court's comments and rulings before he was cross-examined. The petitioner acknowledged that counsel objected to Wiseman's testimony and asked for a mistrial, but counsel did not raise that issue on appeal.

Alice Johnson, a long-time friend of the petitioner and one of his proposed alibi witnesses, testified that she remembered August 7, 2001, the day of the murder, because her dog died that day. She said that the petitioner was "dropped off by Tim" around 8:00 p.m. on August 6 and stayed at her house for three or four nights, leaving on Saturday.[2] She later said that the petitioner was at her house "the whole weekend" and that she really did not know when he left. She elaborated that someone had stolen the petitioner's watch, and he was trying to find it while he was staying at her

---

[1] We will limit the majority of our testimonial summarization to that pertinent to this appeal.

[2] A 2001 calendar reveals that August 7, the day of the murder, was a Tuesday.

house.  However, she recalled that the petitioner never left her house and looked for his watch by inquiring of "everybody who came over [to] [her] house."  She explained that she did not contact the police or the petitioner's attorney to inform him that the petitioner had been at her house because she did not find out the petitioner had been charged until "after he was locked up."

Counsel testified that he was appointed to represent the petitioner at trial and on appeal.  He said that he met with the petitioner seven times in person and talked to him on the telephone once. Counsel recalled that he and the petitioner discussed a possible alibi defense, for which Timothy Hardrick and Alice Johnson were mentioned as potential witnesses.  Counsel discussed the potential witnesses with his investigator, Clark Chapman, and Chapman "did most of the leg work on these witnesses."  Counsel received a memo from Chapman relaying that the petitioner "advised him that Mr. Hardrick had some other issues and wouldn't be a good person to contact and that Ms. Johnson had some health issues and that we probably shouldn't contact her either."  Counsel said that he did not consider contacting the petitioner's alibi witnesses himself because Chapman "was better at it and had talked to [the petitioner] and [the petitioner] had apparently told him to not contact them so that's where we left it."

Counsel testified that he pursued a defense of misidentification, which he tried to prove, in part, by showing that the surviving witness had a difficult time identifying the petitioner.  For that purpose, counsel sought to introduce a Court TV videotape, but the trial court did not allow it to be admitted.  Counsel said that the trial court allowed him to cross-examine Wiseman about the videotape, and Wiseman was in the courtroom during the entire discussion regarding the admissibility of the videotape.

Counsel testified that he kept a list of possible issues to appeal during the trial and then actually appealed only the three or four strongest issues.  He recalled that he considered appealing the exclusion of the Court TV videotape and the court's failure to grant a mistrial based on Kevin Wiseman's testimony being tainted but ultimately decided not to appeal those issues.  Counsel explained that "when it comes time to write the appellate brief, I usually try to narrow the focus a little bit to two or three strong ones. . . .  And for whatever reason in my mind at the time, my judgment I guess, they didn't make the cut."

Clark Chapman, the defense investigator, testified that he met with the petitioner on February 6, 2004, and, thereafter, created a confidential memo to counsel detailing the meeting.  During that meeting, Chapman and the petitioner discussed the possible alibi witnesses, Hardrick and Jones, and the petitioner said that Hardrick "may have been caught up in some issues, and may not be good to have him located and brought to trial."  He recalled that the petitioner also told him that Alice Johnson, whom the petitioner reported to be his aunt, "had some medical issues, and . . . it wouldn't be good to have her brought in, as well."  Chapman noted in his memo that the petitioner told him to focus on the State's evidence rather than his potential alibi witnesses.  Chapman stated that he believed he had made "some attempts" to locate the two witnesses before the petitioner told him "it wouldn't be good to use these individuals."

Following the hearing, the post-conviction court entered a thorough order denying the petitioner post-conviction relief. The petitioner appealed.

## ANALYSIS

On appeal, the petitioner raises three allegations of ineffective assistance of counsel. He asserts that counsel was ineffective for failing to mount an alibi defense at trial and for failing to raise as issues on appeal the trial court's exclusion of the Court TV videotape and the trial court's denial of a mistrial "because of tainted testimony from Kevin Wiseman."

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

## I. Trial Issue

The petitioner first argues that counsel was ineffective for failing to mount an alibi defense at trial.

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

At the evidentiary hearing, the petitioner testified that he gave counsel a letter containing the names of two alibi witnesses. The petitioner denied telling counsel's investigator to cease trying to locate those witnesses. Counsel testified that he received a memo from the investigator, Chapman, relaying that the petitioner "advised him that Mr. Hardrick had some other issues and wouldn't be a good person to contact and that Ms. Johnson had some health issues and that we probably shouldn't contact her either." Chapman thereafter confirmed what counsel had testified to from the memo and added that the petitioner told him to focus on the State's evidence rather than his potential alibi witnesses. The court resolved conflicting testimony against the petitioner and concluded that the petitioner had not established deficient performance. We will not reweigh the post-conviction court's credibility determination. See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Therefore, the petitioner has failed to establish deficient performance.

Along the same lines, the petitioner argues that the broader issue regarding counsel's deficient performance is that counsel failed to confirm directly with the petitioner that he did not want to pursue an alibi defense or investigate the witnesses before discussing with the petitioner whether those witnesses would be beneficial. It was not unreasonable for counsel to rely on the services and the report of his investigator. Cf. Anthony M. Clark v. State, No. M2006-01176-CCA-R3-PC, 2007 WL 2295583, at *8 (Tenn. Crim. App. Aug. 6, 2007), perm. to appeal denied (Tenn. Dec. 17, 2007) (concluding that counsel could reasonably rely on the petitioner's summary of the possible defense witnesses' potential testimony in deciding whether to conduct further investigation and personally interview those witnesses).

In any event, even if the petitioner established deficient performance on the part of counsel, the petitioner has failed to establish prejudice. As noted by the post-conviction court, the petitioner did not offer the testimony of Timothy Hardrick at the evidentiary hearing. To satisfy the prejudice requirement of Strickland when alleging that counsel was ineffective for failing to offer testimony from a favorable witness, the post-conviction petitioner must "(1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness." Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)).

The petitioner did provide the testimony of Alice Johnson, who was either his long-time friend or aunt, at the evidentiary hearing. Johnson stated that the petitioner was at her house on the day of the murder and stayed with her for three or four nights. Upon questioning, Johnson recalled

certain events of the day of August 7, 2001, but did not recall what day of the week it was and her testimony was at times incongruous. The post-conviction court found that Johnson's testimony was not credible or persuasive. The court noted that "[v]iewing her testimony from the witness stand, her testimony did not appear convincing." Again, we will not second-guess a credibility determination made by the post-conviction court. Accordingly, the petitioner has failed to establish a reasonable probability that the result of the proceeding would have been different had his proposed alibi witnesses testified.

## II. Appellate Issues

The petitioner argues that counsel was ineffective for failing to raise the trial court's exclusion of the Court TV videotape and the trial court's denial of a mistrial "because of tainted testimony from Kevin Wiseman" as issues on appeal.

The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). In order to establish the ineffective assistance of appellate counsel, a petitioner must prove that (1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and (2) there was a reasonable probability that the petitioner's appeal would have been successful before the state's highest court had appellate counsel not rendered deficient performance. See, e.g., Smith v. Robbins, 528 U.S. 259, 285-86, 120 S. Ct. 746, 764 (2000); Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Mayo v. Henderson, 13 F.3d 528, 533-34 (2d Cir. 1994). To show that counsel was ineffective for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004) (citing Kimmelman v. Morrison, 477 U.S. 365, 375, 106 S. Ct. 2574 (1986)).

Counsel does not have a constitutional obligation to raise every conceivable argument which might be made on appeal. Id. (citing King v. State, 989 S.W.2d 319, 334 (Tenn. 1999)). The determination of which issues to present on appeal is a matter addressed to the professional judgment and sound discretion of appellate counsel. Porterfield v. State, 897 S.W.2d 672, 678 (Tenn. 1995). This determination is a tactical or strategic choice. Campbell, 904 S.W.2d at 597. "[I]neffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." Kennath Henderson v. State, No. W2003-01545-CCA-R3-PD, 2005 WL 1541855, at *44 (Tenn. Crim. App. June 28, 2005), perm. to appeal denied (Tenn. Dec. 5, 2005).

### A. Court TV Videotape

The petitioner argues that counsel was ineffective for failing to appeal the trial court's ruling that the Court TV videotape of the police investigation was inadmissible to impeach Kevin Wiseman's identification of the petitioner. Counsel testified that it was his practice to narrow the potential issues on appeal to only the three or four strongest issues. Although counsel could not

specifically recall why he did not raise the trial court's exclusion of the Court TV videotape, he said that the decision would have been based on his conclusion that it was not one of the petitioner's strongest issues. The post-conviction court concluded that "the practice of narrowing the issues for the appeal is a reasonable practice for an appellate attorney." We likewise agree that it is a sound tactical decision for an appellate attorney to narrow the issues to present to the appellate court. See Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993) (quoting Jones v. Barnes, 463 U.S. 745, 751-52, 103 S. Ct. 3308, 3313 (1983)) for proposition that "experienced advocates have long 'emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues'"). The petitioner has failed to show that it was objectively unreasonable for counsel not to appeal this issue.

Moreover, the record does not suggest a reasonable probability that an appeal of this issue would have been successful. The trial court based its exclusion of the videotape on the fact that it was "dramatized and misleading" and had been edited to utilize split screens and different angles. The court described the video as a "commercialized sensationalized Hollywood film," not "an objective constantly running camera for C-SPAN or for some civics class." The court further noted that the video showed Wiseman identifying the petitioner, so it was not "exculpatory or directly contradictory" of Wiseman's testimony. We note that the videotape was not included in the record before us. Furthermore, the trial court allowed the petitioner to cross-examine Wiseman about his initial ability to identify the petitioner as illustrated in the video, just without utilization of the video. The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. See State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004); State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000); State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999). We simply fail to see any reasonable probability that the reviewing court would have determined that the trial court abused its discretion in excluding the Court TV videotape.

### B. Mistrial

The petitioner argues that counsel was ineffective for failing to appeal the trial court's denial of his motion for a mistrial based upon Kevin Wiseman's presence in the courtroom during the discussion regarding the Court TV videotape that took place prior to Wiseman's cross-examination. The record shows that the day after the jury-out hearing regarding the admissibility of the Court TV videotape, counsel moved for a mistrial on the basis that Wiseman "could have been able to tailor his testimony to [the court's] instructions . . . as to what would be allowed . . . into evidence if he said what he said, and what would not be allowed in evidence if he said something differently."[3] The court denied the petitioner's motion on the basis that the discussion dealt almost exclusively with the admissibility of the video for impeachment purposes and dealt with Wiseman's identification

---

[3] The record shows that counsel did not make a contemporaneous objection upon discovering that Wiseman was in the courtroom. However, the following day, counsel moved to exclude Wiseman's testimony, presumably in its entirety, and after that was denied, requested a mistrial.

only to the extent of what was reflected on the videotape. The court also noted that the television on which they watched the video was not visible to Wiseman.

We initially note that the petitioner has arguably waived review of this issue for failing to provide any citation to authorities in support of his argument. See Tenn. R. Crim. App. 10(b). Regardless of waiver, again, the post-conviction court determined that it was a reasonable practice for an appellate attorney to narrow the issues on appeal, and we agree. See Cooper, 849 S.W.2d at 747. The petitioner has failed to show that it was objectively unreasonable for counsel to not appeal the trial court's denial of a mistrial. Moreover, we do not discern any prejudice caused by this alleged deficiency.

Whether to declare a mistrial lies within the sound discretion of the trial court, and its decision in this regard will not be overturned on appeal absent a showing of an abuse of discretion. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id. (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)); State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527 (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).

As noted above, the trial court addressed its reasons for declining to grant a mistrial, and the record before us supports its reasoning. We simply cannot conclude that there is any reasonable probability that had this issue been appealed, the reviewing court would have determined that the trial court abused its discretion in denying the petitioner's motion for a mistrial.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-12-